UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

INT'L ASS'N OF MACHINISTS AND AEROSPACE
WORKERS DIST. LODGE 19; and DARREN
LONGWAY,

|  |  |
|---|---|
| Plaintiffs, | 19-CV-1238 |
|  | (GTS/TWD) |

v.

CSX TRANS., INC.,

Defendant.
_____

APPEARANCES:                                          OF COUNSEL:

BLITMAN & KING LLP                          BRIAN J. LACLAIR, ESQ.
  Co-Counsel for Plaintiff
443 North Franklin Street, Suite 300
Syracuse, NY 13204

GUERRIERI BARTOS & ROMA PC            JEFFREY BARTOS, ESQ.
  Co-Counsel for Plaintiff                         JOHN J. GRUNERT, JR., ESQ.
1900 M Street, NW, Suite 700
Washington, DC 20036

JONES DAY                                        DONALD MUNRO, ESQ.
  Co-Counsel for Defendant                     THOMAS R. CHIAVETTA, ESQ.
51 Louisiana Avenue, NW
Washington, DC 20001

NIXON PEABODY LLP                          SUSAN C. RONEY, ESQ.
  Co-Counsel for Defendant
40 Fountain Plaza, Suite 500
Buffalo, NY 14202

GLENN T. SUDDABY, United States District Judge

## DECISION and ORDER

Currently before the Court, in this action filed by the International Association of

Machinists and Aerospace Workers District Lodge 19 ("IAM") and Darren Longway (together

"Plaintiffs") against CSX Transportation, Inc. ("Defendant") under the Family and Medical Leave Act ("FMLA"), are the parties' cross-motions for summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt. No. 43; Dkt. No. 44.) For the reasons set forth below, Defendant's motion for summary judgment granted, and Plaintiffs' motion for summary judgment is denied.

## I.    RELEVANT BACKGROUND

### A.    Plaintiffs' Claims

Generally, liberally construed, Plaintiffs' Complaint alleges that, in September 2017, Defendant changed the policy by which it calculated the "workweek" of its IAM-represented employees for purposes of the FMLA's requirement that "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period" for one or more covered reasons such as a "serious health condition" or the birth of a child. (Dkt. No. 1, at ¶¶ 7, 9, 12.) More specifically, the Complaint alleges that, while the prior policy calculated that "workweek" based upon a scheduled 40-hour week, the new policy calculates that "workweek" based on upon the average hours worked each "workweek" over the prior 52 weeks, excluding time taken for FMLA leave and thus penalizing employees for past use of FMLA leave. (*Id*. ¶ 13.) Simply stated, "CSX . . . uses the average of [the] hours worked, rather than the employee's actual scheduled upcoming workweek[,] to calculate the amount of FMLA leave which it will allow." (*Id*.)

As a result of this policy change, Plaintiffs' Complaint alleges, Defendant's machinists are provided with less than the 12 workweeks of FMLA leave to which they are entitled under the law. (*Id*. ¶ 14.) For example, the Complaint alleges, under the prior policy, Defendant treated each 8-hour increment of Plaintiff Longway's FMLA leave as 20% of a "workweek" for

purposes of calculating his annual allotment of 12 workweeks of FMLA leave; however, under the new policy, Defendant treated each 8-hour increment of Plaintiff Longway's FMLA leave as 28% of a "workweek" for those purposes. (*Id*. at ¶¶ 20-25.) As a result, the Complaint alleges, Plaintiff Longway exhausts his 12 "workweek" limit of FMLA leave under the new policy much more quickly than he did under the prior policy (i.e., after only 43 days rather than after 60 days). (*Id*. at ¶ 26.)

Also as a result of this policy change, Plaintiffs' Complaint alleges, Defendant subjects employees to discipline based on unapproved work absences that had previously been treated as protected FMLA leave. (*Id*. at ¶ 16.) For example, the Complaint alleges, after Defendant began counting each 8-hour increment of Plaintiff Longway's FMLA leave as 28% of his workweek, he began to incur additional disciplinary attendance points (for leave needed to address his health condition), leading to his termination by Defendant in September 2018. (*Id*. at ¶ 28.)

Finally, Plaintiffs' Complaint alleges that, although Defendant has attempted to justify this policy change based on a federal regulation that allows for the use of a past "weekly average" if an employee's schedule "varies from week to week to such an extent that an employer is unable to determine with any certainty how many hours the employee would otherwise have worked (but for the taking of FMLA leave)," that regulation does not apply to Defendant's machinist employees, because those employees bid for, and are awarded, work schedules consisting of a regularly scheduled 40-hour workweek. (*Id*. at ¶¶ 11, 17-18.)

Generally, based on these allegations, the Complaint asserts one claim on behalf of both Plaintiffs: that Defendant has interfered with, restrained and denied Plaintiffs' exercise of their

rights protected by the FMLA in violation of 29 U.S.C. § 2615(a).  (*Id.* at 6-7.)

**B.      Undisputed Material Facts**

**1.      Defendant's Motion for Summary Judgment**

Unless otherwise noted, the following facts were asserted and supported with accurate citations by Defendant in its Statement of Material Facts and expressly admitted, or denied without appropriate record citations, by Plaintiff in their response thereto.  (*Compare* Dkt. No.43, Attach. 1 [Def.'s Rule 7.1 Statement] *with* Dkt. No. 46, Attach 1 [Plfs.' Rule 7.1 Resp.].)

Machinist Work Hours and Overtime

1.      CSXT employs machinists who are responsible for inspecting, servicing, repairing, and maintaining diesel engines.

2.      The International Association of Machinists and Aerospace Workers, District Lodge 19 represents CSXT's machinists, and their terms and conditions of employment are governed by a collective bargaining agreement between CSXT and IAM.

3.      The CBA provides that, subject to certain exceptions, CSXT "will establish, for all [machinists], . . . a work week of 40 hours, consisting of five days of eight hours each, with two consecutive days off in each seven."

4.      Despite being scheduled for 40 hours per week, a machinist's actual workweek can vary from week to week due to overtime and other factors.

5.      A machinist could work more than 40 hours per week or less than 40 hours per week.

4

6.      Some overtime worked by machinists is mandatory whereas other overtime worked by machinists is voluntary.

7.      Overtime is unpredictable; neither CSXT nor a machinist knows with certainty how much overtime will be worked from week to week.[1]

8.      The amount of overtime available for machinists depends on a variety of factors including employee headcount, train traffic on CSXT's system, the number of employees on vacation or otherwise unavailable, unexpected delays encountered while maintaining or repairing equipment, and unplanned events such as train accidents or derailments which may necessitate unscheduled maintenance or repairs.

9.      A machinist who wants to work overtime is placed on the overtime call list at his location, and overtime is generally offered first to employees on that list.

10.      When overtime is needed, a manager or union representative calls employees in the order in which their names appear on the overtime list.  An employee who is called for overtime moves to the bottom of the list, regardless of whether the employee accepts the overtime, declines the overtime, or does not answer the call, and all of the other employees on

---

[1]      After expressly admitting the above-stated fact, Plaintiffs attempt to (1) deny a perceived implication of it (i.e., the extent to which "overtime" means something other than "the total system-wide amount of overtime which CSXT will require"), and (2) assert additional facts in their response to this paragraph rather than in separately numbered paragraphs in accordance with Local Rule 56.1(b) (i.e., "Overtime is predictable as to an individual Machinist" in three particular ways, "Machinists are not called for overtime at random," and "Voluntary overtime is predictable as to an individual Machinist" in a particular way).  This is improper.  *See Yetman v. Capital Dis. Trans. Auth.*, 12-CV-1670, 2015 WL 4508362, at *10 (N.D.N.Y. July 23, 2015) (citing authority for the point of law that the summary judgment procedure involves the disputation of *asserted* facts, not the disputation of *implied* facts).

the list move up one spot.  If nobody on the list agrees to work the overtime, it can then be force-assigned to a machinist (including one who asked to be removed from the overtime call list).

11.     Instead of calling someone from the overtime list, management can hold an employee over past the end of his shift to complete an assignment that was started during his shift.[2]

12.     The actual amount of overtime worked varies widely by employee.

13.     In 2016, CSXT machinists system-wide worked approximately 194,000 hours of overtime, which averaged out to approximately 240 hours of overtime per machinist.

14.     In 2017, CSXT machinists system-wide worked approximately 144,000 hours of overtime, which averaged out to approximately 204 hours of overtime per machinist.

15.     In 2018, CSXT machinists system-wide worked approximately 136,000 hours of overtime, which averaged out to approximately 223 hours of overtime per machinist.

---

[2]     Although Plaintiffs deny the entirety of Defendant's originally stated fact, they provide a record cite that supports a denial of only a portion of it (i.e., the fact that an employee could be held over "for up to two hours").  As a result, they have effectively admitted the remainder of Defendant's originally stated fact, which is stated above. *See* Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of the record . . . or . . . showing that the materials cited do not establish the absence . . . of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."); Prindle v. City of Norwich, 15-CV-1481, 2018 WL1582429, at *2 n.2 (N.D.N.Y. Mar. 27, 2018) ("In this portion of his Rule 7.1 Response, Plaintiff made a blanket denial of all of the facts in the corresponding paragraph of Defendants' Rule 7.1 Statement but cited a portion of the record that disputed only one of the facts asserted by Defendants, in violation of the District's Local Rules of Practice.").

16.     In 2019, CSXT machinists system-wide worked approximately 115,000 hours of overtime, which averaged out to approximately 189 hours of overtime per machinist.

17.     Just because a machinist works little to no overtime in one week does not mean he will work little to no overtime in the following week.

18.     The amount of overtime worked by individual machinists changes from week to week and from year to year.

19.     Prior to September 1, 2017, CSXT calculated the FMLA entitlement of machinists as if they each actually worked 40 hours per week.  This method resulted in all FMLA-eligible machinists receiving 480 hours of FMLA leave in a 12-month period.

20.     Because some machinists worked more than 40 hours per week and others worked less than 40 hours per week, CSXT's former method of calculating the FMLA entitlement resulted in a leave entitlement that was the same for employees who averaged less than 40 hours per week as it was for employees who averaged more than 40 hours per week.[3]

21.     Because they were all being treated as if they had a 40-hour workweek prior to September 1, 2017, machinists were not being charged with having taken any FMLA leave when they used it as leave from working mandatory overtime.[4]

---

[3]     Although Plaintiffs dispute Defendant's characterization of the leave entitlement as "overly generous" for one group and less "generous" for another group, they do not provide a record cite that disputes the above-stated fact. As a result, they have effectively admitted it.

[4]     Although Plaintiffs dispute Defendant's characterization of FMLA leave as being used "to avoid working mandatory overtime," they do not provide a record cite that disputes Defendant's evidence that FMLA leave was sometimes used as leave from working mandatory overtime (without the user being charged with having taken any FMLA leave).  As a result,

22.     Effective September 1, 2017, CSXT began calculating each machinist's FMLA entitlement based on the employee's average hours including all overtime in the 12 months prior to the start of the leave period.

23.     In calculating the average hours of each machinist, CSXT counts all hours worked, as well as FMLA leave and other types of leave.

24.     Pursuant CSX's current policy, a machinist's FMLA entitlement is now equal to 12 times his weekly average hours in the 12 months prior to the start of the FMLA leave.

25.     For machinists who were already certified for FMLA leave as of September 1, 2017, CSXT calculated their FMLA leave entitlement going forward based on the employee's average hours during the 12-month period preceding the day on which the employee first used FMLA leave on or after September 1, 2017 (the date that the policy change took effect).

26.     Many employees subject to the policy averaged more than 40 hours per week, and thus as a result of the change received more FMLA leave on a per-hour basis than they would have received previously.

27.     The only machinists who received less FMLA leave on a per-hour basis than they would have received previously were those who averaged less than 40 hours per week.

28.     Effective September 1, 2017, CSXT began charging employees with having taken FMLA leave when they refused to work mandatory overtime on the basis of a FMLA-qualifying condition.

---

Plaintiffs have effectively admitted the above-stated fact.

8

29.     A CSXT machinist who refuses to work voluntary overtime is not deemed by CSXT to have taken any FMLA leave, regardless of the reason for the refusal.

<u>Plaintiff Longway's Hours</u>

30.     Plaintiff Darren Longway worked for CSXT as a machinist at its locomotive repair shop in Selkirk, New York from January 17, 2011, until September 26, 2018.

31.     Machinists at Selkirk worked one of three shifts; Mr. Longway worked the third shift, which ran from 11:00 p.m. until 7:00 a.m.

32.     Mr. Longway and the other Selkirk machinists clocked in when they got to work and clocked out when they left work.

33.     Despite being scheduled for 40 hours per week, from September 1, 2016, to September 1, 2017 (the year before the FMLA policy change took effect), Mr. Longway rarely ever did so.

34.     In the twelve months prior to September 2017, Mr. Longway worked only 162 days, and left work early on 93 of those 162 days.

35.     Despite averaging less than 40 hours per week, Mr. Longway sometimes worked overtime.

36.     Some of the overtime worked by Mr. Longway was mandatory whereas other overtime was voluntary.

37.     The amount of overtime worked by Mr. Longway varied from week to week.

38.     Mr. Longway could not predict when he would be called for overtime.[5]

39.     On days when overtime was needed or required, the length of the overtime varied.

40.     The amount of overtime worked by Selkirk machinists varied widely from person to person.[6]

41.     Mr. Longway logged less than 2,000 straight time hours in 2015, 2016, 2017, and/or 2018.

42.     Despite logging less than 2,000 straight time hours in each of the years 2015 through 2017 (the last three full years of his employment), Mr. Longway still logged 39.10 hours of overtime in 2015; 40.00 hours of overtime in 2016; and 58.35 hours of overtime in 2017.

43.     Among Selkirk machinists logging at least 2,000 straight time hours in 2015, individual overtime ranged anywhere from 24 hours to 1,693 hours.

44.     Among Selkirk machinists logging at least 2,000 straight time hours in 2016, individual overtime ranged anywhere from 21 hours to 2,080 hours.

---

[5]     After expressly admitting the above-stated fact, Plaintiffs improperly attempt to assert additional facts in their response to this paragraph rather than in separately numbered paragraphs (i.e., "that Longway would know how recently he had last been called for overtime, that he had moved to the bottom of the overtime list, and that he would not be called again until the complete list had been called over again").

[6]     After expressly admitting the above-stated fact, Plaintiffs attempt to assert an additional fact in their response to this paragraph rather than in a separately numbered paragraph (i.e., that "the amount of voluntary overtime was within the Machinists' control in that they could decline to accept it"). This is improper. Furthermore, they do so without a supporting record cite. This also is improper.

45.     Among Selkirk machinists logging at least 2,000 straight time hours in 2017, individual overtime ranged anywhere from 13 hours to 1,615 hours.

46.     Among Selkirk machinists logging at least 2,000 straight time hours in 2018, individual overtime ranged anywhere from 16 hours to 1,641 hours.

<u>Plaintiff Longway's FMLA Leave</u>

47.      Plaintiff first applied for and received FMLA leave in 2012, and was required […] to renew it on an annual basis thereafter.

48.     Prior to September 1, 2017, CSXT calculated Mr. Longway's FMLA entitlement using a 40-hour workweek, crediting him with 480 hours of leave in a 12-month period.  As a result, each time Mr. Longway used FMLA leave to mark off for an 8-hour shift, CSXT deducted 0.2 workweeks of leave from his 12-workweek entitlement.

49.     Effective September 1, 2017, CSXT began calculating the FMLA leave entitlement of each machinist based on his average weekly hours.  The first day after that date on which Mr. Longway used FMLA leave was September 2, 2017, and so his FMLA entitlement was calculated using his average hours from September 1, 2016, through September1, 2017.

50.     In calculating Mr. Longway's average hours, CSXT counted all hours worked, as well as FMLA leave and other types of leave taken in the 12 months prior to September 2, 2017.

51.     CSXT determined that Mr. Longway averaged approximately 28.5 hours per week during the time period of September 1, 2016, through September 1, 2017.  As a result, from

September 2, 2017, forward, each time Mr. Longway used FMLA leave to mark off for an 8-hour shift, CSXT deducted 0.28 workweeks of leave from his 12-workweek entitlement.

52.     Mr. Longway averaged less than 40 hours per week from September 1, 2016, through September 1, 2017, in part because he failed to timely return FMLA leave certification and recertification forms on several occasions during that time period.   Due to this failure, absences that may have otherwise qualified as FMLA leave were instead classified as unexcused absences and excluded from the calculation of Mr. Longway's average weekly hours.[7]

53.     On November 10, 2016, Mr. Longway's doctor submitted a Certification of Health Care Provider Form estimating that Mr. Longway would need intermittent FMLA leave for migraine headaches 3-4 times per year, and 1-2 days per episode.  Mr. Longway's doctor also estimated that Mr. Longway's migraine headaches would necessitate 3-4 doctor's appointments per year.

54.     On November 18, 2016, CSXT approved Mr. Longway to use intermittent FMLA leave when necessary because of his own serious health condition during the period of October 2, 2016, through October 1, 2017.  His approved use was for "3-4 episodes per year, 1-2 days per episode and 3-4 office visits per year."

---

[7]     Although Plaintiffs admit the first clause of the above-stated fact, they neither admit nor expressly deny the remainder of the above-stated fact. This is improper. *See* Fed. R. Civ. P. 56(e)(2) ("If a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion . . . ."). Rather, they attempt to assert an additional fact in their response to this paragraph rather than in a separately numbered paragraph under Local Rule 56.1(b) (i.e., that "that the timeliness of his FMLA certification and recertification forms were subjects raised in grievances between the IAM and CSXT").  This also is improper.

55.     From October 2016 through January 2017, Mr. Longway used FMLA leave at a rate exceeding 3-4 times per year.

56.     On February 14, 2017, CSXT issued a letter notifying Mr. Longway that "[a] review of your FMLA usage shows that the circumstances described in your Certification of Healthcare Provider Form ("medical certification") have changed significantly (e.g., frequency and/or duration of your FMLA absences)," and directing him to provide "an updated medical certification from your health care provider" by March 6, 2017.

57.     Mr. Longway did not provide an updated medical certification by March 6, 2017.

58.     Because he did not provide an updated medical certification by March 6, 2017, CSXT issued a letter notifying Mr. Longway that his "request for FMLA leave is cancelled effective [March 8, 2017]."  The letter further "directed [Mr. Longway] not to use FMLA leave," and stated that "[a]ny absences conditionally designated as FMLA or that do not otherwise meet the FMLA guidelines may be changed to unexcused."

59.     Mr. Longway requested FMLA leave for absences on March 19-20, March 27-29, and April 10, 2017, but these requests were denied due to his failure to provide an updated medical certification by March 6, 2017.

60.     Mr. Longway marked off FMLA leave for absences on April 23-26, April 30, and May 7, 2017.

61.     On May 8, 2017, CSXT issued a letter to Mr. Longway noting that he had requested leave under the FMLA and directing him to return a certification from his health care provider by May 26, 2017.  The letter further stated that CSXT would "conditionally designate

13

the leave you have requested as FMLA leave," but that "if you fail to provide the documentation

by the due date, . . . this conditional designation will be withdrawn" and "[a]ny FMLA mark-offs

or FMLA absences during the conditional period may be changed to unexcused . . . ."

62.     Mr. Longway did not return a certification from his health care provider by May

26, 2017.

63.     On May 31, 2017, CSXT issued a letter to Mr. Longway notifying him that his

request for FMLA leave was denied due to his failure to return his medical certification by May

26, 2017.  The letter further stated that "[a]ny FMLA absences conditionally designated as

FMLA will be changed to unexcused . . . ."

64.     Mr. Longway requested FMLA leave for absences on April 23-26, April 30, May

7, May 13-14, May 17, May 22, May 27, June 3, and June 5-7, 2017, but these requests were

denied due to his failure to provide a medical certification by May 26, 2017.

65.     To calculate the amount of FMLA leave an employee has remaining, CSXT uses

a rolling 12-month period measured backward from the date that FMLA leave is used by the

employee.

66.     As of September 1, 2017, Mr. Longway had only 0.46 workweeks of FMLA leave

remaining.

<u>Plaintiff Longway's Dismissal</u>

14

67.     CSXT machinists are subject to an attendance policy under which employees are assessed points for certain absences but not for FMLA leave.  The number of points assessed varies depending on the nature of the absence.

68.     Attendance problems are handled progressively through a four-step process. Employees are counseled at Step 1 and 2; formally reprimanded at Step 3; and dismissed at Step 4.  In general, each time an employee accumulates 20 points, he is counseled or disciplined. Each time an employee is counseled or disciplined, his point total is reduced by 10, and the employee proceeds to the next step of the attendance policy.  For purposes of dismissal only, the 20-point threshold is increased by two points for each five years of service by the employee.  As a result, an employee with six years of service who was at Step 3 of the attendance policy would need to accrue 22 points (as opposed to 20 points) before that employee could be dismissed.

69.     The collective bargaining agreement provides that "[n]o employee will be disciplined without a fair hearing by a designated officer of the company."  As a result, unless an employee waives his right to a hearing, CSXT holds one before reprimanding or dismissing an employee under the attendance policy.

70.     As of September 1, 2017, Mr. Longway was at Step 1 of the attendance policy, and had 16 points on his record.

71.     On September 17, 2017, Mr. Longway missed work and was assessed 2 points for this absence, bringing his total to 18 points.  Mr. Longway testified that he did not request FMLA leave for this absence.

15

72.     On October 10, 2017, Mr. Longway missed work and was assessed 4 points for this absence, bringing his total to 22 points.  Mr. Longway marked off FMLA for this absence but had already exhausted his FMLA leave, and so his request for FMLA leave on this date was denied.[8]

73.     Because he exceeded the 20-point threshold, Mr. Longway progressed to Step 2 of the attendance policy and received a second counseling letter.  His attendance points were then reduced by 10, bringing his total to 12 points.

74.     On November 29, 2017, Mr. Longway missed work and was assessed 4 points for this absence, bringing his total to 16 points.  Mr. Longway marked off FMLA for this absence but had already exhausted his FMLA leave, and so his request for FMLA leave on this date was denied.[9]

75.     On December 6, 2017, Mr. Longway missed work and was assessed 4 points for this absence, bringing his total to 20 points.  Mr. Longway marked off FMLA for this absence but had already exhausted his FMLA leave, and so his request for FMLA leave on this date was denied.[10]

---

[8]     After expressly admitting the above-stated fact, Plaintiffs attempt to assert an additional fact in their response to this paragraph rather than in a separately numbered paragraph (i.e., that "his leave was exhausted pursuant to CSXT's new leave formula").  This is improper. Furthermore, they do so without a supporting record cite.  This also is improper.

[9]     *See, supra,* note 8 of this Decision and Order.

[10]     *See, supra,* note 8 of this Decision and Order.

76.     Because he was at the 20-point threshold, Mr. Longway progressed to Step 3 of the attendance policy and received a formal reprimand.  His attendance points were then reduced by 10, bringing his total to 10 points.

77.     As of January 2018, Mr. Longway had 7 years of service, and so he could not be dismissed until he reached at least 22 points.

78.     On January 22, 2018, Mr. Longway missed work and was assessed 2 points for this absence, bringing his total to 12 points.  Mr. Longway marked off FMLA for this absence but had already exhausted his FMLA leave, and so his request for FMLA leave on this date was denied.[11]

79.     On January 23, 2018, Mr. Longway missed work and was assessed 2 points for this absence, bringing his total to 14 points.  Mr. Longway marked off FMLA for this absence but had already exhausted his FMLA leave, and so his request for FMLA leave on this date was denied.[12]

80.     On March 1, 2018, after having perfect attendance for the month of February 2018, Mr. Longway received a Good Attendance Credit (i.e., a deduction of three attendance points from his record), leaving him with 13 points.

---

[11]     *See, supra,* note 8 of this Decision and Order.

[12]     *See, supra,* note 8 of this Decision and Order.

81.     On March 7, 2018, Mr. Longway missed work and was assessed 2 points for this absence, bringing his total to 15 points.  Mr. Longway marked off on this date because of inclement weather; this absence had nothing to do with FMLA leave.

82.     On March 14, 2018, Mr. Longway missed work and was assessed 2 points for this absence, bringing his total to 17 points.  Mr. Longway claims that he marked off FMLA for this absence, but records show that the request was denied.

83.     On March 24, 2018, Mr. Longway missed work and was assessed 2 points for this absence, bringing his total to 19 points.  Mr. Longway marked off FMLA for this absence but had already exhausted his FMLA leave, and so his request for FMLA leave on this date was denied.[13]

84.     On March 25, 2018, Mr. Longway missed work and was assessed 2 points for this absence, bringing his total to 21 points.  Mr. Longway marked off FMLA for this absence but had already exhausted his FMLA leave, and so his request for FMLA leave on this date was denied.[14]

85.     On March 26, 2018, Mr. Longway missed work and was assessed 2 points for this absence, bringing his total to 23 points.  Mr. Longway marked off FMLA for this absence but had already exhausted his FMLA leave, and so his request for FMLA leave on this date was denied.[15]

---

[13]     *See, supra,* note 8 of this Decision and Order.

[14]     *See, supra,* note 8 of this Decision and Order.

[15]     *See, supra,* note 8 of this Decision and Order.

86.     Because Mr. Longway exceeded the 22-point threshold, CSXT dismissed him pursuant to the attendance policy.[16]

### 2.     Plaintiffs' Motion for Summary Judgment

Unless otherwise noted, the following facts were asserted and supported with accurate citations by Plaintiffs in their Statement of Material Facts and expressly admitted, or denied without appropriate record citations, by Defendant in its response thereto.  (*Compare* Dkt. No. 44, Attach. 1 [Plfs.' Rule 7.1 Statement] *with* Dkt. No. 45, Attach. 1 [Def.'s Rule 7.1 Resp].)

1.     This Court has original jurisdiction over this action, which arises under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601, *et seq*., pursuant to 28 U.S.C. § 1331.

2.     Venue in this District is proper pursuant to 28 U.S.C. § 1391 and Plaintiff Darren Longway was employed by CSXT at its rail yard in Selkirk, New York, within this Court's geographic boundaries.  Some of the events relevant to this lawsuit took place within the Northern District of New York.

3.     Defendant CSXT is a Class I rail carrier which does business in this judicial district.

4.     Mr. Longway was hired by CSXT as a Machinist in January 2011 and

---

[16]     After expressly admitting the above-stated fact, Plaintiffs attempt to assert additional facts in their response to this paragraph rather than in separately numbered paragraphs under Local Rule 56.1(b) (i.e., that "Longway accrued attendance points for absences following exhaustion of his FMLA leave under CSXT's new leave formula" and that "[u]nder CSXT's prior formula Longway would not have expended FMLA leave and accrued attendance at the same rate").  This is improper.  Furthermore, they do so without a supporting record cite.  This also is improper.

remained employed until his termination on September 26, 2018.

5.      CSXT maintains a facility, the Selkirk Yard, at 1 Bell Crossing Road, Selkirk,

New York, at which Mr. Longway was employed.

6.      CSXT employs approximately 650 Machinists nationwide and approximately 60-

100 active machinists at the Selkirk yard.[17]

7.      The International Association of Machinists and Aerospace Workers, AFL-CIO

(the "IAM") is a labor organization which represents employees nationwide in the freight and

passenger rail industries, among many others. District Lodge 19 ("DL-19") is an intermediate

level affiliate of the IAM with representational responsibility at various rail carrier employers.

Among other things, DL-19 is the collective bargaining representative of Machinists employed

by CSXT, including at its Selkirk yard.

8.      DL-19 and CSXT are parties to a collective bargaining agreement (the "CBA")

governing the terms and conditions of employment of Machinist employees of CSXT. The

current DL-19 – CSXT agreement became effective October 31, 2012.

9.      Rule 1, Hours of Service, of the CBA provides in part as follows:

>       An eight (8) hour period shall, under provisions hereinafter set out,
>       be the regular work day. Regular work day and work week hours
>       shall be bulletined.
>
>       […]
>
>       (a)     GENERAL – This Carrier will establish, for all employees
>               represented by the organization signatory hereto, subject to the
>               exceptions contained in this rule, a work week of 40 hours,
>               consisting of five days of eight hours each, with two
>               consecutive days off in each seven; the work weeks may be

---

[17]    (*Compare* Dkt. No. 44, Attach. 3, at ¶ 3 [Sandberg Decl.] *with* Dkt. No. 45, Attach. 5, at ¶ 3 [Dreher Decl.].)

staggered in accordance with the carrier's operational
requirements; so far as practicable the days off shall be
Saturday and Sunday. The foregoing work week rule is subject
to the provisions which follow:

(b)     FIVE-DAY POSITIONS – Where the nature of the work is
such that employees will be needed five days each week, the
rest days will be either Saturday and Sunday or Sunday and
Monday.

10.     Rule 2, Assignment of Shifts, of the CBA provides that the work day can consist

of up to three shifts of eight hours each starting at 7:00 AM and covering all 24 hours in a day.

11.     Rule 4, Overtime – Payment and Distribution, of the CBA regards the distribution

of overtime, the operation of an overtime call board (or call list), and mandatory overtime in the

event of the exhaustion of the overtime call board.

12.     The CBA by Rule 28, "Claims or Grievances," and Rule 29, "Discipline"

provides for the imposition of discipline and a grievance and arbitration process to challenge

discipline.

13.     CSXT maintains a Mechanical Attendance Point System ("APS") policy which

assesses employees a certain number of attendance points for various incidents of absence. Types

of attendance/absence events include the following: absent with permission, absent without

permission, sick with documentation, and arriving late or leaving early. An employee is subject

to progressive attendance "handling" each time he accumulates 20 or more points. Points will be

deducted following periods of satisfactory attendance. The APS policy provides for four

handling steps: two counseling letters, a formal reprimand, and finally termination, subject to the

CBA's discipline and grievance procedure. The fourth time an employee reaches 20 or more

points he or she may be subject to termination. For purposes of dismissal only, the 20-point

threshold at which employees are disciplined is increased two (2) points for each five (5) years of service.[18]

14. In 2017-2018, CSXT has *generally* operated three shifts of eight hours each for Machinists at the Selkirk Yard.

15. As a Machinist, Mr. Longway was scheduled for a regular 40 hour workweek consisting of five days of eight hours each. During his employment at CSXT, Mr. Longway most commonly bid for and was assigned to work the third shift, or night shift, of 11:00 PM to 7:00 AM, five days a week, including in 2017 and 2018.

16. Some CSXT Machinists perform voluntary overtime more commonly than mandatory overtime.

17. Since early in his employment at CSXT, Mr. Longway had applied for and been approved by CSXT, subject to periodic renewal, for the use of intermittent FMLA leave.

18. By letter dated July 11, 2017, CSXT renewed its approval for Mr. Longway's intermittent FMLA leave. The letter approved him for intermittent FMLA leave for the period of "06/11/2017 through 06/10/2018" for use of "UP TO 2 episodes per week, 2-3 days per episode and 4 office visits per year" for "up to 12 workweeks of leave during any 12-month period which is calculated using a 'rolling' 12-month period measured backward from the date an employee uses any FMLA leave." As of July 11, 2017, Mr. Longway had 4.20 workweeks of FMLA leave remaining.[19]

19. Prior to September 1, 2017, CSXT calculated FMLA entitlement for Machinists

---

[18]    (Dkt. No. 44, Attach. 3, at 39-43 [Attendance Points System].)
[19]    (Dkt. No. 44, Attach. 3.)

based on the 40 hour regularly scheduled workweek, regardless of the number of hours that a Machinist actually worked from week to week. Under this method, 12 workweeks of FMLA leave equated to 480 total hours of leave (40 hours per week times 12 workweeks). This would result, for the use of leave for an eight hour period, in the deduction of 0.20 workweeks (20% of a workweek) of leave from the employee's 12 workweek total.

20.     Under the pre-September 2017 FMLA policy, CSXT deducted 0.20 workweeks of leave (from Mr. Longway's 12-workweek entitlement) each time he used FMLA leave for a scheduled 8-hour shift.

21.     For an example of the prior policy, in the month of June 2017 Mr. Longway used five days of FMLA leave, June 11, 17, 18, 19, and 20, 2017, and CSXT deducted 0.20 weeks for each day. Each of these days was a scheduled eight-hour shift.

22.     Prior to September 2017, CSXT's method of calculation effectively resulted in Mr. Longway being eligible to take 60 days of FMLA leave before exhausting his 12-workweek entitlement, and Mr. Longway would have been scheduled to work 8 hours on each of those days.

23.     In late 2016, CSXT established a cross-functional internal working team, which included representation from CSX's benefits group, technology, labor relations, human resources, information systems, and legal departments.

24.     A purpose of the internal working team, among others, was to review and analyze data on employee availability for work across crafts.

25.     A component of the internal working team was the "FMLA working group," which formed a recommendation that amendments be made to the formula in use under CSX's

FMLA policy for non-operating employees with regard to the calculation of FMLA workweeks. The amendment consisted of replacing the assumed flat 40-hour week with a formula based on a weekly average of hours worked (taking into account the hours for which the employee took FMLA and other types of leave).

26.     On August 16, 2017, CSXT announced to employees changes to its FMLA policy that would be effective September 1, 2017. The announcement stated in part as follows:

> FMLA entitlement for all craft employees . . . will be based on
> weekly average hours worked. Weekly averages are determined by
> the hours worked over the 12 months prior to the start of leave,
> including hours for which the affected employee already took
> certain types of leave, such as FMLA, vacation, etc. Additionally,
> FMLA leave hours used for mandatory overtime hours will be
> deducted from the employee's FMLA balance and will be included
> in the calculation of the average hours worked.

27.     Effective September 1, 2017, CSXT began calculating a Machinist's FMLA leave entitlement based on a weekly average of the employee's hours over the 12 months prior to the first date on or after September 1, 2017, on which he used FMLA leave, within a certified leave period.  Under the new policy, CSXT counts FMLA leave and certain other forms of leave towards an employee's average hours.

28.     The new FMLA policy could result in the deduction of more than, less than, or the same 0.20 workweeks of FMLA leave from the employee's 12-workweek entitlement each time FMLA leave was used for a shift scheduled to last eight hours, depending on each employee's weekly average of hours worked (taking into account hours spent by the employee on FMLA and other types of leave) over the prior 12 months.

29.     After September 1, 2017, CSXT began to deduct 0.28 (28%) of a workweek for each eight hour period of leave taken by Mr. Longway, instead of 0.20 (20%) of a workweek as

it had done previously.

30.     Based on his average workweek calculated pursuant to the policy that took effect September 1, 2017, over a 12-month period, Mr. Longway could have taken FMLA leave on 43 full days on which he was scheduled to work eight hours before exhausting his 12-workweek FMLA entitlement.  As of when the policy took effect, however, Mr. Longway had only 0.46 workweeks of FMLA leave remaining.

31.     Rule 1 of the CBA, providing for a regular 40-hour workweek, remained effective for the duration of Mr. Longway's employment and remains effective to the present.

32.     Mr. Longway was scheduled to work 40 hours per week, both before and after September 1, 2017.

33.     On March 23, 2018, CSXT sent Mr. Longway a notice stating as follows:

> According to our record[s], you have exhausted your leave entitlement under the FMLA and/or similar state leave law. We anticipate that additional FMLA leave will become available for your use on 06/11/2018. Therefore, you are directed not to use FMLA leave before that date.

34.     The notice of March 23, 2018, further stated that, within the previous 30 days, Mr. Longway had used FMLA leave on March 3, 4, 5, 7, 12, and 13, 2018, and that CSXT deducted 0.28 workweeks of FMLA leave for each such use.

35.     On May 29, 2018, CSXT sent Mr. Longway a notice to attend an investigation hearing, File No. 321865, regarding information received that he had reached or exceeded the threshold for discipline handling under the APS policy on about March 26, 2018.

36.     On June 20, 2018, CSXT sent Mr. Longway a notice instructing him to attend an investigation hearing, File No. 322591, regarding information received that he had

misused FMLA leave on April 16 and May 14, 15, 16, and 19, 2018.

37.     As of December 2017, Mr. Longway was at Step 3 of the APS policy and subject

to termination the next time he reached 22 or more attendance points.

38.     On September 6, 2018, formal investigation hearings for File No. 321865,

the alleged APS violation, and File No. 322591, the alleged FMLA misuse, were held in Selkirk,

New York, before CSXT Hearing Officer Doug Hall. Mr. Longway was present and represented

by Mr. Sandberg.

39.     On September 26, 2018, CSXT sent Mr. Longway a notice informing him that it

had determined that he had violated the FMLA Leave Policy by misusing FMLA leave on April

16, May 14-16, and May 19, 2018. The notice also stated, in pertinent part, as follows (with the

emphasis in the original):

> Therefore, you are assessed thirty (30) days actual suspension to be
> held in **abeyance pending the final results of File 321865.**
>
> **Please arrange your return to work with your immediate
> supervisor. Your failure to do so will be considered an absence
> without authority and may result in further disciplinary action.**

40.     On September 26, 2018, CSXT sent Mr. Longway a notice informing him that it

had determined that he had violated the APS policy by reaching or exceeding the threshold for

discipline on about March 26, 2018, and that he was therefore terminated.

41.     The Union grieved Mr. Longway's termination pursuant to the CBA grievance

process and CSXT denied the grievance at each step.

42.     On November 20, 2019, Mr. Longway's termination grievance was heard by

Neutral Member Thomas N. Rinaldo of Public Law Board No. 7539, the final step.

43.     On March 23, 2020, Neutral Member Rinaldo issued P.L.B. No. 7539 Awards

26

No. 102 and No. 103 denying Mr. Longway's grievances, regarding his termination and his held-in-abeyance 30-day suspension respectively.

44.     These investigation hearings concerned whether CSXT violated the CBA regarding Mr. Longway and did not involve interpretation of the FMLA.

45.     If CSXT had not changed the manner by which it calculated the FMLA entitlement of machinists as of September 1, 2017, then Mr. Longway would still have had FMLA leave remaining in March 2018.

### C.     Parties' Briefing on the Their Motions for Summary Judgment

#### 1.     Defendant's Motion for Summary Judgment

##### a.     Defendant's Memorandum of Law

Generally, in support of its motion for summary judgment, Defendant argues that Plaintiff IAM's claim should be dismissed for three reasons: (1) the FMLA does not create a private right of action for labor unions, because (a) the plain language of the FMLA authorizes only "employees" to sue for damages or equitable relief, and (b) in any event, the right-of-action provision in the FMLA is identical to the right of action in the Fair Labor Standards Act ("FSLA"), which other courts have determined does not authorize representative actions by labor unions; (2) to the extent that Plaintiff IAM argues that it has associational standing to sue, that argument lacks merit, because (a) again, the FMLA does not authorize organizations to sue, and (b) even if it did so, one of the requirements of such standing is that neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit (and here the claim asserted requires proof of the individual circumstances of Plaintiff IAM's members, and the requested relief of "mak[ing] whole . . . all other employees" requires the participation of

individual machinists); and (3) Defendant's use of the Variable Workweek Method to calculate the FMLA leave entitlement of machinists is lawful, because (a) the total amount of FMLA leave depends on the length of the employee's actual workweek, (b) although Defendant's machinists are nominally scheduled for 40 hours per week, the machinists' actual workweek varies unpredictably from week to week and from machinist to machinist (due to, among other things, overtime, some of which is voluntary), (c) Plaintiff IAM's argument that voluntary overtime should not be counted towards FMLA leave relies on a confusing (nonbinding and non-deferential) opinion letter issued by the U.S. Department of Labor in 1999 that was not clarified until 2008 when the Department promulgated a supplanting regulation, 29 C.F.R. § 825.205, which expressly prohibited voluntary overtime hours *not worked* due to a FMLA-qualifying reason from being counted *against* the employee's FMLA leave entitlement (and thus implicitly permitted voluntary overtime hours *worked* to be counted *towards* an employee's FMLA entitlement), and (d) the regulation is consistent with the FMLA, which allows employers to adopt "leave policies more generous than policies that comply with the requirements of this Act" (*see* 29 U.S.C. § 2653).  (Dkt. No. 43, Attach. 2.)

Similarly, Defendant argues that Plaintiff Longway's claim should be dismissed for two reasons: (1) Defendant's use of the Variable Workweek Method to calculate his FMLA entitlement was lawful, because his actual workweek varied and Plaintiff Longway conceded his overtime was unpredictable; and (2) even if Plaintiff Longway could show that Defendant's use of the Variable Workweek Method was inappropriate, he cannot show that it caused his dismissal, because Defendant dismissed Plaintiff Longway pursuant to its attendance policy (due to three absences unrelated to him exhausting his FMLA leave), not "by reason of" the FMLA

28

policy challenged, for purposes of 29 U.S.C. § 2617(a)(1)(A)(i)(I).  (*Id.*)

> b.      **Plaintiffs' Opposition Memorandum of Law**

Generally, in opposition to Defendant's motion, Plaintiffs assert the following three arguments: (1) Defendant's policy violates the FMLA because (a) the regulations permit the use of weekly average hours only when employee's scheduled workweeks vary widely from week to week, and (b) here, Defendant's machinists' scheduled workweeks do not vary widely given that by contract the machinists have a fixed schedule, and variations in voluntary overtime (as opposed to mandatory overtime) do not create a variable schedule under the FMLA (which treats voluntary overtime as external to a "workweek" schedule, not a component of it); (2) Plaintiff Longway has standing, because the undisputed facts show that, if Defendant had properly calculated Plaintiff Longway's leave entitlement, the leave would have been deducted at a slower rate than it was, and he would not have exhausted his leave on the particular dates that he did; and (3) Plaintiff IAM has associational standing, because (a) all machinists (even those who have averaged above 40 hours in the previous 12 months) have been "left with less stability because their average hours worked may vary from year to year," causing them to "feel pressured to pick up voluntary overtime shifts that they otherwise would not have out of concern . . . that their hours may drop later in the year," (b) although Plaintiff IAM's claim seeks declaratory, injunctive and monetary relief with regard to all machinists adversely affected, it "is not now seeking any [such] individualized [monetary] relief" for those machinists (other than Plaintiff Longway), but only declaratory and injunctive relief, and (c) that relief may be awarded through "a blanket restoration" of the 480 hours of leave that Defendant had previously credited to all machinists based on their 40-hour workweek (rather than a recalculation of average hours for

29

each machinist).  (*See generally* Dkt. No. 46.)

### c.    Defendant's Reply Memorandum of Law

Generally, in reply to Plaintiffs' opposition, Defendant asserts two arguments: (1)
Plaintiffs have failed to show that their claim may proceed, because (a) although Plaintiff IAM
has argued that all machinists have been injured by Defendant's new policy by feeling "less
stability" and "pressure[] to pick up voluntary overtime shifts," feeling instability or pressure
does not rise to the level of "consequential harm" required to obtain relief for an employer's
violation of the FMLA (and, even if it did, Plaintiff IAM cites no admissible record evidence to
show that any machinist has experienced such feelings), and (b) Plaintiff Longway has failed to
show that his dismissal resulted from the policy challenged (as opposed to his three absences
unrelated to him exhausting his FMLA leave, which he has conceded); and (2) Defendant
lawfully calculates machinists' FMLA leave entitlement, because (a) machinists' actual
workweeks indisputably and unpredictably vary, which means the Variable Workweek Method
applies (despite Plaintiffs' misreading of the 2008 regulation and 1999 opinion letter), and (b)
Plaintiffs' voluntary-mandatory overtime distinction is a red herring, because it is not relevant to
the term "actual workweek" contained in the clarifying regulation promulgated by the U.S.
Department of Labor in 2008, and, even if it were relevant, Plaintiffs mischaracterize most
machinists' overtime as "voluntary" (given that even a machinist who voluntarily places his
name on the overtime call board can be mandated to work overtime once on the board).  (*See
generally* Dkt. No. 47.)

### 2.    Plaintiffs' Motion for Summary Judgment

### a.    Plaintiffs' Memorandum of Law

Generally, in support of their motion for summary judgment, Plaintiffs argue that Defendant's application of a Variable Workweek Method to employees working a fixed schedule violates the FMLA for two reasons: (1) the Fixed Workweek Method applies based on the plain language of the 2008 regulation, 29 C.F.R. § 825.205, because (a) the terms "workweek" and "normally scheduled hours" must be defined in the FMLA context (and are done so by the 1999 opinion letter), (b) the CBA expressly defines the machinists' "usual or normal schedule" as "a work week of 40 hours, consisting of five days of eight hours each," and (c) the controlling factor is the number of hours an employee is scheduled to work in advance (such as what is scheduled at the start of the month or the start of the week), which is not affected if an employee later works more hours, due to overtime or other reasons, or less hours, due to a sick day or other reasons; and (2) the Variable Workweek Method does not apply, because (a) the 2008 regulation presumes the existence of a fixed workweek in a given workplace and that leave entitlement is to be calculated by the Fixed Workweek Method, (b) the plain language of the 2008 regulation states that the Variable Workweek Method applies only if (the employer can rebut the above-referenced presumption by showing that) the employee's schedule "varies from week to week" *and* the employer is unable to determine "with any certainty" how many hours the employee would have worked absent the taking of leave, (c) thus, the prerequisite for an employer to use the Variable Workweek Method is an uncertainty-causing variable workweek in *scheduled* hours at the start of shift(s) or week, not just a variation in hours that happened to have been worked in retrospect, and (d) caselaw demonstrates that Defendant's policy violates the FMLA.  (*See generally* Dkt. No. 44, Attach. 4.)

> **b.**    **Defendant's Opposition Memorandum of Law**

Generally, in opposition to Plaintiffs' motion, Defendant asserts two arguments: (1) Defendant's use of the Variable Workweek Method complies with the FMLA, because (a) an employee's leave entitlement is based on his "actual workweek" and not his nominally scheduled workweek, and (b) machinists' actual workweeks vary widely and unpredictably in that (i) there exists no "presumption" of a fixed workweek that an employer has a "burden" to overcome, (ii) from 2016 through 2019, Defendant's machinists on average worked between 115,000 and 194,000 hours of overtime each year, or roughly 189 to 240 hours each year per machinist (with any given machinist at Defendant's Selkirk shop working between 13 and 1,615 overtime hours in 2017, between 16 and 1,641 overtime hours in 2018, and between 30 and 1,356 overtime hours in 2019), (iii) for the purposes of determining an employee's actual workweek, Plaintiffs' voluntary-mandatory overtime distinction is a red herring, and (iv) Plaintiffs' cited cases about other employees with different actual workweeks are distinguishable in that, in each case, the reason that the Variable Workweek Method did not apply was that the variation in the actual workweek was minimal, determinable, or not at issue; and (2) even if the Court were to disagree with Defendant as to whether the Variable Workweek Method is appropriate to calculate machinists' leave entitlement, Plaintiffs' claims would be barred, because (a) Plaintiff IAM cannot sue on behalf of its members under the FLMA (given that labor unions do not have a cause of action under the FMLA, and Plaintiff IAM lacks associational standing to assert its claim for "make whole" relief, which requires highly individualized proof to decide), and (b) Plaintiff Longway cannot show that his dismissal resulted from the challenged policy as opposed to from his three absences that had nothing to do with his exhaustion of the FMLA leave under the policy challenged (nor can he show that Defendant's adherence to its prior policy would have

forestalled exhaustion of his leave bank for a meaningfully longer period of time).  (*See generally* Dkt. No. 45.)

### c.    Reply Memorandum of Law

Generally, in reply to Defendant's opposition, Plaintiffs assert three arguments: (1) the Variable Workweek Method is inapplicable, because (a) that method is permitted only if variation in the employee's schedule precludes *any* certainty as to the hours an employee will work, (b) here, the CBA's fixed schedule of a 40-hour workweek (comprised of five days of eight-hour shifts, beginning at 7:00 a.m., 3:00 p.m., and 11:00 p.m.) is adhered to and is not merely "nominal," (c) being absent, arriving late, staying late, and leaving early do not create a variable schedule, and (d) working overtime for Defendant does not create a variable schedule (given that volunteering for the "overtime call board" does not require a machinist to subsequently report for overtime); (2) Defendant's unlawful policy injured Plaintiff Longway, because (a) his accrual of attendance points, and thus his termination, resulted from the unavailability of sufficient FMLA leave under the Variable Workweek Method, and (b) his cognizable injury has been established by Defendant's acknowledgment that its prior policy would have forestalled his exhaustion of leave for at least some period of time, whether or not that period was deemed "meaningful[]" to Defendant; and (3) Plaintiff IAM may seek uniform group relief, because the prospective relief sought does not require individual calculations for any machinist, aside from Plaintiff Longway, who has joined the suit as a separate plaintiff.  (*See generally* Dkt. No. 48.)

## II.    RELEVANT LEGAL STANDARDS

### A.    Legal Standard Governing Motions for Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[20]  As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted."  *Anderson*, 477 U.S. at 248.

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant.  *Anderson*, 477 U.S. at 255.  In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact."  *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986).  However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial.  Fed. R. Civ. P. 56(a), (c), (e).[21]

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant

---

[20]     As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact."  *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted].  As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

[21]     Among other things, Local Rule 56.1 (previously Local Rule 7.1[a][3]) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching number paragraphs, and supports any denials with a specific citation to the record where the factual issue arises.  N.D.N.Y. L. R. 56.1.

willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute. Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp. 2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3). What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 56.1 (previously Local Rule 7.1[a][3]) by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement.[22]

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3).[23] Stated another way, when a non-movant fails to oppose a legal argument

---

[22]    *Cusamano*, 604 F. Supp. 2d at 427 & n.6 (citing cases).

[23]    *See, e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]); *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

asserted by a movant, the movant may succeed on the argument by showing that the argument possess facial merit, which has appropriately been characterized as a "modest" burden.  *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein . . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL 2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

## III.    ANALYSIS

Construed together, the parties' motions present the following three issues: (1) whether Plaintiff IAM has associational standing to assert its claim; (2) whether Defendant's use of the Variable Workweek Method caused a cognizable injury to Plaintiff Longway; and (3) whether Defendant's machinists have schedules that are "variable" as defined by the U.S. Department of Labor.  The Court will address these issues in order.

### A.    Whether Plaintiff IAM Has Associational Standing to Assert Its Claim

"[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).

As indicated above in Part I.C. of this Decision and Order, Defendants argue that, for purposes of the third prong of the *Hunt* standard, the "claim asserted" and "relief requested" here require the participation of the machinists other than Plaintiff Longway for two reasons: (1)

Plaintiff IAM could prevail on its claim only to the extent that it could show that machinists

other than Plaintiff Longway (a) received less FMLA leave as a result of the policy, (b)

exhausted their leave entitlement, and (c) would not have exhausted their leave entitlement but

for the policy change; and (2) whether and to what extent such machinists were entitled to

monetary relief (for example, through back pay for any machinist who was suspended or

dismissed as a result of the policy) would vary from machinist to machinist.  (Dkt. No. 43,

Attach. 2; *see also* Dkt. No. 45.)

　　　In response, Plaintiff IAM argues that the "claim asserted" and "relief requested" do not

require the participation of the machinists other than Plaintiff Longway for two reasons: (1) all

machinists could prevail on its FMLA interference claim without participation in the lawsuit,

because even those machinists who have averaged above 40 hours in the previous 12 months

(and thus receive more than 480 hours of leave under the new policy than under the old policy)

have been "left with less stability because their average hours worked may vary from year to

year," causing them to "feel pressured to pick up voluntary overtime shifts that they otherwise

would not have out of concern . . . that their hours may drop later in the year"; and (2) although

its claim seeks declaratory, injunctive and monetary relief with regard to all machinists adversely

affected (other than Plaintiff Longway), it "is not now seeking any [such] individualized

[monetary] relief" for those machinists, but only declaratory and injunctive relief, which is

prospective in nature and may be awarded through "a blanket restoration" of the 480 hours of

leave that Defendant had previously credited to all machinists based on their 40-hour workweek

(rather than a recalculation of average hours for each machinist).  (Dkt. No. 46; *see also* Dkt. No.

48.)

In reply, Defendant argues that (1) feelings "less stability" and "pressure[] to pick up voluntary overtime shifts" do not rise to the level of "consequential harm" required to obtain relief for an employer's violation of the FMLA under *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 90-91 (2002), and (2) even if they did so, Plaintiff IAM has adduced no evidence to show that any machinist has experienced such feelings.  (Dkt. No. 47; *see also* Dkt. No. 45.)

After carefully considering the matter, the Court finds that Plaintiff IAM does not have associational standing to assert its claim for the reasons stated by Defendant in its memoranda of law.  To those reasons, the Court adds only two points, which are intended to supplement and not supplant Defendant's reasons.

First, under the circumstances, Plaintiff IAM cannot voluntarily discontinue its request for monetary relief in order to avoid the effect of this aspect of Defendant's motion for summary judgment. Plaintiffs' operative pleading (their Complaint) requests monetary relief on Plaintiff IAM's claim, and their opposition memorandum of law does not request leave to file an Amended Complaint that omits such requested relief.  (*Compare* Dkt. No. 1, at 7 *with* Dkt. No. 46.)  Moreover, because Defendant has moved for summary judgment, Plaintiff IAM cannot voluntarily dismiss this request for relief without either a stipulation signed by Defendant or Court order (both of which are lacking).  Fed. R. Civ. P. 41(a).[24]

Second, even if Plaintiff IAM could do so and leave only its request for declaratory and

---

[24]    The Court notes also that it is not even clear whether Plaintiff IAM's abandonment is intended to be temporary or permanent in nature.  (Dkt. No. 46, at 19, n.9 [stating, "The Complaint seeks a make whole remedy for Longway and all other employees adversely affected by the violation, but the IAM is ***not now seeking*** any individualized relief, other than with regard to Longway."] [emphasis added].)  Of course, any such attempt at a temporary abandonment (to avoid the effect of Defendant's motion for summary judgment) would be in vain.

injunctive relief,[25] Plaintiff IAM has not shown that those machinists other than Plaintiff

Longway "otherwise have standing to sue in their own right" for purposes of the first prong of

the *Hunt* standard.  This is because no admissible record evidence has been adduced that those

machinists (other than Plaintiff Longway) who received less FMLA leave as a result of the

policy both (1) have exhausted their leave entitlement, and (2) would not have done so but for

the policy change.  (*See generally* Dkt. Nos. 43, 44, 45.)  Moreover, Plaintiff IAM cites no case

for the point of law that "feel[ing] pressured" as a result of a loss of job "stability" could

constitute "consequential harm" for purposes of *Ragsdale*.  (*See generally* Dkt. Nos. 44, 46,

48.)[26]  Finally, even if such feelings could constitute "consequential harm," Plaintiff IAM cites

no admissible record evidence from which a reasonable jury could find that any machinist has

experienced such feelings.  (*Id*.)

      For each of these alternative reasons, the Court grants Defendant's motion for summary

judgment, and denies Plaintiffs' cross-motion for summary judgment, on this issue; and the

---

[25]    For the sake of brevity, the Court will assume that Defendant's "blanket restoration" of
480 hours of leave could be achieved without "the participation of individual members in the
lawsuit" for purposes of *Hunt*.  For example, the Court will assume that those machinists who
have received *more* FMLA leave (on a per-hour basis) under Defendant's new policy than under
its old policy would not need to somehow consent to the change.

[26]    The Court notes that the FMLA does not appear to allow for the recovery of damages
from "feel[ing] pressured" as a result of a loss of job "stability."  *See, e.g., Graham v. State Farm
Mut. Ins. Co*., 193 F.3d 1274, 1284 (11th Cir. 1999) ("[T]he FMLA does not allow recovery for
emotional distress or the loss of job security."); *McAnnally v. Wyn South Molded Products, Inc*.,
912 F. Supp. 512, 513 (N.D. Ala.1996) ("The term ['other compensation' in the FMLA] does not
imply a reimbursement formula for 'mental distress' stemming from loss of job security."); *cf.
Vicioso v. Pisa Bros., Inc.*, 98-CV-2027, 355415, at *4 (S.D.N.Y. July 1, 1998) ("Courts have
also refused to award damages [on an FMLA claim] for pain and suffering, . . . emotional
distress, and humiliation, . . .  On similar grounds, injured employees may not recover for anxiety
. . suffered as a result of a FMLA violation.") (internal quotation marks and citations omitted).

Court dismisses Plaintiff IAM's claim for lack of standing.

**B.**   **Whether Defendant's Use of the Variable Workweek Method Caused a Cognizable Injury to Plaintiff Longway**

"To make out a prima facie case on a claim for interference with FMLA rights under 29 U.S.C. § 2615(a)(1), a plaintiff must establish five elements: (1) that he is an eligible employee under the FMLA; (2) that defendant is an employer as defined in the FMLA; (3) that he was entitled to take leave under the FMLA; (4) that he gave notice to the defendant of his intention to take leave; and (5) that he was denied benefits to which [ ]he was entitled under the FMLA." *Achille v. Chestnut Ridge Transp., Inc.*, 584 F. App'x 20, 21 (2d Cir. 2014) (internal quotation marks omitted). "Although it has not been formally incorporated into the required elements for an FMLA interference claim, the Second Circuit has suggested that a terminated plaintiff must also show that the employer "considered [the exercise of his FMLA rights] a negative factor in its decision to terminate [him]." *Hewett v. Triple Point Tech., Inc.*, 171 F. Supp.3d 10, 16 (D. Conn. 2016); *see also Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 176 (2d Cir. 2006) (observing that such evidence would be required for the survival of either a retaliation claim or an interference claim); *cf. Ragsdale*, 535 U.S. at 82 ("§ 2617 provides no relief unless the employee has been prejudiced by the [employer's] violation"); 29 U.S.C. § 2617(a)(1)(A)(i)(I) ("Any employer who violates section 2615 of this title shall be liable to any eligible employee affected . . . for damages equal to . . . the amount of . . . any wages, salary, employment benefits, or other compensation denied or lost to such employee *by reason of* the violation.") (emphasis added).

As indicated above in Part I.C. of this Decision and Order, Defendant argues Plaintiff Longway cannot show that his dismissal resulted from the challenged policy as opposed to from

three absences unrelated to him exhausting his FMLA leave (nor can he show that Defendant's adherence to its prior policy would have forestalled exhaustion of his leave bank for a meaningfully longer period of time).  (Dkt. No. 43, Attach. 2; *see also* Dkt. No. 45.)

In response, Plaintiffs argue that (a) Plaintiff Longway's accrual of attendance points, and thus his termination, resulted from the unavailability of sufficient FMLA leave under the Variable Workweek Method, and (b) the cognizability of his injury has been established by Defendant's acknowledgment that its prior policy would have forestalled his exhaustion of leave for at least some period of time, whether or not that period was deemed "meaningful[]" to Defendant.  (Dkt. No. 46; *see also* Dkt. No. 48.)

After carefully considering the matter, the Court finds that a genuine dispute of material fact exists regarding whether Defendant's use of the Variable Workweek Method caused a cognizable injury to Plaintiff Longway.  The Court renders this finding regardless of whether the causation standard governing Plaintiff Longway's interference claim is a motivating-factor causation standard or a more-exacting but-for causation standard.  *See, e.g., Slade v. Alfred Univ.*, 11-CV-0396, 2013 WL 6081710, at *1-2 (finding that, "[e]ven when this Court analyzes plaintiff's [FMLA interference and retaliation] claims using the 'but for' standard suggested by defendant, it finds that there remains a triable issue of fact as to whether plaintiff was terminated in retaliation for taking FMLA qualifying leave," where "plaintiff was ultimately fired because she left work early and without permission on October 26, 2009 to attend a veterinary appointment," following "her allegedly FMLA eligible absences on October 2, 7 and 8 of 2009").

For all of these reasons, the Court denies the parties' cross-motions for summary

41

judgment on this issue.

**C.      Whether Defendant's Machinists Have Schedules that Are "Variable" as Defined by the U.S. Department of Labor**

The FMLA entitles "an eligible employee" to take "a total of 12 workweeks of leave during any 12-month period" because of "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). This protected leave may be taken in a single block, or "intermittently" in segments of a single day or less than a single day "when medically necessary." 29 U.S.C. § 2612(b)(1).  For the use of intermittent leave, the U.S. Department of Labor has promulgated regulation 29 C.F.R. § 825.205 (entitled "Increments of FMLA leave for intermittent or reduced leave schedule") explaining how an employer is to convert intermittent leave hours into portions of an employee's 12 workweek FMLA entitlement.  29 C.F.R. § 825.205.  In particular, 29 C.F.R. § 825.205 provides as follows, in pertinent part:

> (b) Calculation of leave.

>> (1) When an employee takes leave on an intermittent or reduced leave schedule, only the amount of leave actually taken may be counted toward the employee's leave entitlement. The actual workweek is the basis of leave entitlement. Therefore, if an employee who would otherwise work 40 hours a week takes off eight hours, the employee would use one-fifth (1/5) of a week of FMLA leave. Similarly, if a full-time employee who would otherwise work eight hour days works four-hour days under a reduced leave schedule, the employee would use one-half (1/2) week of FMLA leave. Where an employee works a part-time schedule or variable hours, the amount of FMLA leave that an employee uses is determined on a pro rata or proportional basis. If an employee who would otherwise work 30 hours per week, but works only 20 hours a week under a reduced leave schedule, the employee's 10 hours of leave would constitute one-third (1/3) of a week of FMLA leave for each week the employee works the reduced leave schedule. An employer may convert these fractions

> to their hourly equivalent so long as the conversion equitably reflects the employee's total normally scheduled hours.
>
> . . .
>
> (3) If an employee's schedule varies from week to week to such an extent that an employer is unable to determine with any certainty how many hours the employee would otherwise have worked (but for the taking of FMLA leave), a weekly average of the hours scheduled over the 12 months prior to the beginning of the leave period (including any hours for which the employee took leave of any type) would be used for calculating the employee's leave entitlement.
>
> (c) Overtime. If an employee would normally be required to work overtime, but is unable to do so because of a FMLA–qualifying reason that limits the employee's ability to work overtime, the hours which the employee would have been required to work may be counted against the employee's FMLA entitlement. In such a case, the employee is using intermittent or reduced schedule leave. . . . Voluntary overtime hours that an employee does not work due to an FMLA–qualifying reason may not be counted against the employee's FMLA leave entitlement.

29 C.F.R. § 825.205.

As Plaintiffs acknowledge, the parties agree that 29 C.F.R. § 825.205 is the pertinent regulation, but disagree as to whether Defendant's machinists are governed by the method set forth in Section 825.205(b)(1) (known as the "Fixed Workweek Method" or "Fixed Schedule Method") or the method set forth in Section 825.205(b)(3) (known as the "Variable Workweek Method" or "Variable Schedule Method"). (Dkt. No. 46, at 5.)

More specifically, as indicated above in Part I.C. of this Decision and Order, Defendant argues that its machinists are governed by the Variable Workweek Method for six reasons: (1) Section 825.205(b) expressly provides that the "basis of leave entitlement" is "[t]he actual workweek"; (2) although Defendant's machinists are nominally scheduled to work 40 hours per week, the machinists' actual workweek varies unpredictably from week to week and from

machinist to machinist (due to, among other things, overtime, some of which is voluntary); (3) for example, from 2016 through 2019, any given machinist at Defendant's Selkirk shop worked between 13 and 1,615 overtime hours in 2017, between 16 and 1,641 overtime hours in 2018, and between 30 and 1,356 overtime hours in 2019); (4) Plaintiff IAM's argument that voluntary overtime should not be counted towards FMLA leave relies on a (nonbinding and non-deferential) opinion letter issued by the U.S. Department of Labor in 1999, which Department itself described in 2008 as having "caused confusion" (*see* 73 Fed. Reg. 7876, 7894 [Feb. 11, 2008]); (5) as a result, the Department promulgated a revision of Section 825.205, which expressly prohibits voluntary overtime hours *not worked* due to a FMLA-qualifying reason from being counted *against* the employee's FMLA leave entitlement (and thus implicitly permits voluntary overtime hours *worked* to be counted *towards* an employee's FMLA entitlement); and (6) the regulation is consistent with the FMLA, which allows employers to adopt "leave policies more generous than policies that comply with the requirements of this Act" (*see* 29 U.S.C. § 2653.  (Dkt. No. 43, Attach. 2; *see also* Dkt. No. 45.)

In response, Plaintiffs argue that Defendant's machinists are governed by the Fixed Workweek Method for six reasons: (1) the terms "workweek" and "normally scheduled hours" in Section 825.05 must be defined in the FMLA context (and are done so by the U.S. Department of Labor's 1999 opinion letter); (2) the CBA expressly defines the machinists' "usual or normal schedule" as "a work week of 40 hours, consisting of five days of eight hours each"; (3) being absent, arriving late, staying late, and leaving early do not create a variable schedule; (4) working overtime for Defendant does not create a variable schedule, because volunteering for the "overtime call board" does not require a machinist to subsequently report for overtime; (5) the

controlling factor is the number of hours an employee is scheduled to work in advance (such as what is scheduled at the start of the month or the start of the week), which is not affected if an employee later works more hours, due to overtime or other reasons, or less hours, due to a sick day or other reasons; and (6) the Variable Workweek Method does not apply, because (a) Section 825.205 presumes the existence of a fixed workweek in a given workplace and that leave entitlement is to be calculated by the Fixed Workweek Method, (b) Section 825.205 provides that the variable method applies only if (the employer can rebut the above-referenced presumption by showing that) the employee's schedule "varies from week to week" and the employer is unable to determine "with any certainty" how many hours the employee would have worked (absent the taking of FMLA leave), and (c) caselaw demonstrates that Defendant's policy violates the FMLA.  (Dkt. No. 46; *see also* Dkt. No. 44, Attach. 4; Dkt. No. 48.)

In reply, Defendant argues that (1) Plaintiffs' voluntary-mandatory overtime distinction is a red herring (because it is not relevant to the term "actual workweek" contained in Section 825.205, and, in any event, even a machinist who voluntarily places his name on the overtime call board can be mandated to work overtime once on the board), (2) there exists no "presumption" of a fixed workweek that an employer has a "burden" to overcome, and (3) Plaintiffs' cited cases about other employees with different actual workweeks are distinguishable in that, in each case, the reason that the Variable Workweek Method did not apply was that the variation in the actual workweek was minimal, determinable, or not at issue.  (Dkt. No. 47; *see also* Dkt. No. 45.)

After carefully considering the matter, the Court finds that Defendant's machinists have schedules that are "variable" as defined by the U.S. Department of Labor for the reasons stated

by Defendant in its memoranda of law.  To those reasons, the Court adds three points, which are intended to supplement and not supplant Defendant's reasons.

First, based on Defendant's Undisputed Material Fact Numbers 6 through 18, the Court finds as a matter of law that, between 2016 and 2019, the schedules of Defendant's machinists varied from week to week (and machinist to machinist) to such an extent that Defendant was unable to determine with any certainty how many hours its machinists would have worked (but for the taking of FMLA leave).  *See, supra,* Part I.B.1. of this Decision and Order.

In opposing this finding, Plaintiffs rely on Section 825.205's pronouncement that "[v]oluntary overtime hours that an employee does not work due to an FMLA-qualifying reason may not be counted against the employee's FMLA leave entitlement."  29 C.F.R. § 825.205.  As an initial matter, the Court is not persuaded by Plaintiffs' suggestion that the *vast* majority of the overtime referenced in Defendant's Undisputed Material Fact Numbers 13 through 16 was voluntary.  Uncontroverted record evidence exists establishing that "CSXT does not track whether overtime was mandatory or voluntary."  (Dkt. No. 43, Attach. 15, at ¶ 12 [Hatcher Decl.].)[27]  Moreover, Plaintiffs cite no admissible record evidence in support of their argument

---

[27]    The Court notes that, in support of their argument that overtime worked as a result of a machinist's placement of his name on Defendant's Overtime Calling List is voluntary and not mandatory, Plaintiffs cite the deposition testimony of IAM General Chairman Andrew Sandberg, which states, when an employee who answers a call, is asked to work overtime, he does not need to take it. (Dkt. No. 43, Attach. 5, at 8-9 [Sandberg Depo. Tr.].)  However, read in its entirety, this testimony makes clear that, when an employee does so, he is penalized by losing his turn on the Overtime Calling List.  (*Id*.)  Moreover, this testimony of Chairman Sandberg appears to be only general in nature, when considered together with CBA Rule 4 and the declaration of Senior Director of Locomotive Engineering & Reliabilut Charles Hatcher, which make clear that, under certain circumstances, employees who place their names on the Overtime Calling List can be required to work overtime.  (Dkt. No. 44, Attach. 3, at 29 [CBA Rule 4–"Distribution of Overtime" Paragraph "(g)," providing that, "[s]hould there not be sufficient number of employees volunteer to properly take care of the work, any employee must respond after the

that "CSXT had the ability to record which blocks of overtime were mandatory or voluntary, but [merely] choose not to . . . ."  (Dkt. No. 56, at 10, n.4 [Plfs.' Opp'n Memo. of Law].)  In any event, even if all of the hours were in fact voluntary, Section 825.205 is conspicuously silent about prohibiting voluntary overtime hours that an employee *does* work from being counted *towards* the employee's FMLA leave entitlement (implying that it permits such a counting).  *Cf.* 2A *Sutherland Statutory Construction* § 47:23 *Expressio unius est exclusio alterius* (7th ed. 2022).

The Court's interpretation of Section 825.205 is in no way changed by the language in the Department of Labor's 1999 opinion letter, which states that, "[i]f overtime hours are on an 'as needed basis' and are not part of the employee's usual or normal workweek, or is voluntary, such hours would neither be counted to calculate the amount of the employee's FMLA leave entitlement, nor charged to the employee's usual or normal workweek."  DOL Opinion Letter FMLA–107, 1999 WL 1002421 (July 19, 1999) (emphasis removed).  For the sake of brevity, the Court will not linger on the fact that opinion letters from the U.S. Department of Labor "lack the force of law" and "do not warrant *Chevron*-style deference." *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000).  Nor will the Court linger on the fact that this particular opinion letter is not even entitled to respect, given that the Department itself has cited the letter as a source of

---

overtime call board is exhausted"]; Dkt. No. 43, Attach. 15, at ¶¶ 11-12 [Hatcher Decl., stating, "If nobody on the list agrees to work the overtime, it can be force-assigned to a machinist (including one who did not volunteer to be on the list). . . .  Overtime that would otherwise be voluntary becomes mandatory if nobody on the overtime call board is willing to take it"].)  Indeed, even employees who do not place their names on the Overtime Calling List can be required to work overtime.  *See, supra,* Defendant's Statement of Fact Nos. 6, 11.  (*See also* Dkt. No. 43, Attach. 4, at 22-23, 25-26 [Longway Depo. Tr., admitting that there were times he was forced to work overtime].)

"confusion" (rather than a source of persuasion).  *See* 73 Fed. Reg. 7876, 7894 (Feb. 11, 2008)

("The Department's enforcement experience and responses to the [Request for Information] lead

us to believe that the distinction between [mandatory overtime, voluntary overtime, and overtime

on an "as needed" basis], and the focus on whether leave would normally need to be used to

cover the hours not worked, has caused confusion."); *Christensen*, 529 U.S. at 587

("[I]nterpretations contained in formats such as opinion letters are 'entitled to respect' under our

decision in *Skidmore v. Swift & Co*., 323 U.S. 134, 140 . . . (1944) . . . only to the extent that

those interpretations have the 'power to persuade' . . . .").  More important is that the letter

regarded a prior version of Section 825.205, which did not contain the relevant regulatory

language (for example, the sentence "The actual workweek is the basis of leave entitlement" and

the clause "to such an extent that an employer is unable to determine with any certainty how

many hours the employee would otherwise have worked").  *See* 73 Fed. Reg. 67934, 67978,

68088 (Nov. 17, 2008) (amending 29 C.F.R. § 825.205 effective Jan. 16, 2009).[28]

Second, the Court agrees with Defendant that the four cases cited by Plaintiffs are

distinguishable.  In each case, the variable-workweek method did not apply, because the

employer could be certain of the employee's actual workweek.  *See Andrews v. CSX Transp.,*

*Inc*., 06-CV-0704, 2009 WL 5176462, at *23 (M.D. Fla. Dec. 22, 2009) (finding, based on an

earlier version of Section 825.205, that the fixed-workweek method applied to crew dispatcher,

---

[28]     The Court notes that it agrees with Defendant that, when Section 825.205(b)(1) refers to
an employee's "normally scheduled hours" in calculating his FMLA leave, it is referred to hours
actually worked, not simply hours nominally scheduled in advance.  *See* 29 C.F.R. §
825.205(b)(1) (providing that "[t]he actual workweek is the basis of leave entitlement," and
giving three examples of how to calculate an employee's FMLA leave on the basis of his "actual
workweek," each example basing the employee's "normally scheduled hours" on the hours the
employee "would otherwise work").

because the variation in his actual workweek was minimal, "[a] fact is borne out by [the crew dispatcher's] erratic logging of overtime hours through the years, sometimes going months without clocking any overtime"); *Clary v. Sw. Airlines*, 07-CV-0126, 2009 WL 10704299, at *2, 6 & n.10 (N.D. Tex. Sept. 30, 2009) (finding that the fixed-workweek method applied to airline employees, because the variation in their actual workweek was easily determinable "by simply looking at the employee's schedule including any shifts the employee picked up or gave away" pursuant to agreement whereby "[e]mployees are free to trade their assigned hours of work on a given day with any other employee in their job category"); *Truitt v. Doyon Drilling, Inc*., 764 F. Supp. 2d 1167, 1169, 1171 (D. Alaska 2010) (finding that the fixed-workweek method applied to oil drill mechanic, because the "two weeks on, two weeks off" variation in his actual workweek was not at issue in that the mechanic's "expected work schedule was known"); *Ray v. AT&T Mobility LLC*, 17-CV-0068, 2020 WL 535787, at *2, 9 (E.D. Ky. Feb. 3, 2020) (finding that the fixed-workweek method applied to retail sales consultant, because the variation in his actual workweek from 32 hours per week to 27.25 hours per week was not at issue in that his employer could determine with certainty "how many hours [the sales consultant] worked" each week).

Third, the Court rejects Plaintiffs' argument that accepting Defendant's overtime argument would "result in the Variable Schedule method entirely consuming the Fixed Schedule method, as it is implausible that there is any workplace in which employees do not sometimes . . . perform some work prior to or after their formally scheduled shifts." (Dkt. No. 46, at 11.) The Court's ruling is confined to the particular facts of this case, which stem in part from the nature of mechanics' work for an interstate rail carrier. As explained in Defendant's Undisputed Material Fact No. 8, "[t]he amount of overtime available for machinists depends on a variety of

49

factors including employee headcount, *train traffic on CSXT's system*, the number of employees on vacation or otherwise unavailable, *unexpected delays* encountered while maintaining or repairing equipment, and *unplanned events such as train accidents or derailments* which may necessitate *unscheduled maintenance or repairs*." *See, supra,* Part I.B.1. of this Decision and Order (emphasis added). *Cf. Brotherhood of Locomotive Eng'rs and Trainmen v. Union Pac. Ry. Co.*, 612 F. Supp.2d 954, 955 (N.D. Ill. 2007) ("Union Pacific engineers work variable schedules because Union Pacific does not schedule its trains in advance and runs them to meet customer demand. To facilitate its variable train schedules, Union Pacific created a 'board' system.").

For each of these alternative reasons, the Court grants Defendant's motion for summary judgment, and denies Plaintiffs' cross-motion for summary judgment, on this issue; and the Court dismisses Plaintiff Longway's claim, because no genuine dispute exists that Defendant's machinists have schedules that are "variable" as defined by the U.S. Department of Labor.

**ACCORDINGLY**, it is

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 43) is **<u>GRANTED</u>**; and it is further

**ORDERED** that Plaintiffs' motion for summary judgment (Dkt. No. 44) is **<u>DENIED</u>**.

Dated: January 31, 2023
   Syracuse, New York

Glenn T. Suddaby
U.S. District Judge